276 P.3d 589

STATE of Hawaiʻi, Respondent/Plaintiff–
Appellee,

v.

Orlando PECPEC, Petitioner/Defendant–
Appellant.

No. SCWC–30500.

Supreme Court of Hawaiʻi.

March 20, 2012.

Stuart N. Fujioka, for petitioner/defendant-appellant.

Keith M. Kaneshiro, Prosecuting Attorney, and Donn Fudo, Deputy Prosecuting Attorney, for respondent/plaintiff-appellee.

RECKTENWALD, C.J., NAKAYAMA, and McKENNA, JJ.; with ACOBA, J., dissenting, with whom DUFFY, J., joins.

Opinion of the Court by
RECKTENWALD, C.J.

Orlando Pecpec was charged in the Family Court of the First Circuit with 25 counts of Violation of an Order for Protection in relation to 25 voicemails and text messages he allegedly sent to the complaining witness, his former spouse. At trial, the first 6 counts were supported only by the testimony of the complaining witness. The jury found Pecpec not guilty on these counts. The remaining 19 counts were supported by 19 exhibits containing either audio recordings of the alleged voicemails or photographs of the alleged text messages. The jury found Pecpec guilty on each of these 19 counts, and the family court sentenced Pecpec to a one-year jail term on each count, to run concurrently, with the exception of Count 13 for which the sentence was to run consecutive to the remaining counts.[1] The Intermediate Court of Appeals affirmed. *State v. Pecpec*, No. 30500, 125 Hawai‘i 240, 2011 WL 2037679 (Haw.App. May 25, 2011).

Pecpec challenges his convictions on Counts 8–15, which refer to 8 voicemails on November 6, 2009; Counts 18–22, which refer to five text messages on November 6, 2009; and Counts 23–25, which refer to three text messages on November 7, 2009. Pecpec argues that these convictions were obtained in violation of his right to a unanimous verdict because the jury was not specifically instructed that it was required to unanimously agree to the specific act that supported each count.

Although the jury instructions identified each count by the date on which the alleged violation occurred and identified whether the violation was made by way of a voicemail or text message, they did not identify the time of the violation or the exhibit to which each count corresponded. Pecpec argues that, because the jury was not informed which count corresponded with which specific incident, the family court was required to provide the jurors with a specific unanimity instruction. Absent such an instruction, Pecpec argues, the jurors may not have unanimously agreed that Pecpec committed the conduct described in each of the 19 counts. Pecpec also argues that his consecutive sentence on Count 13 violates his constitutional rights to due process, equal protection, and to be free from cruel and unusual punishment because it may have been based on a verdict that was not unanimous.

We hold that, under *State v. Mundon*, 121 Hawai‘i 339, 355, 219 P.3d 1126, 1142 (2009), the family court was required to give a specific unanimity instruction in the circumstances of the instant case. However, we

---

1. The Honorable Edward H. Kubo, Jr. presided.

hold that the family court's error did not contribute to Pecpec's convictions, because there is no "genuine possibility" that the jurors could have found Pecpec guilty without unanimously concluding that he committed each of the acts presented in the State's exhibits. *Cf. id.* at 354–55, 219 P.3d at 1141–42. The jury was presented with 19 exhibits, and convicted Pecpec on 19 counts that corresponded to the dates on which the conduct in those exhibits allegedly occurred. The presentation of the evidence, jury instructions, and arguments of both counsel made clear that there was a one-to-one relationship between counts and exhibits. Thus, there is no reasonable possibility that Pecpec was convicted on less than a unanimous verdict. Accordingly, the family court's error in failing to provide a specific unanimity instruction was harmless.

However, we hold that the family court abused its discretion in sentencing Pecpec to a consecutive sentence on Count 13. The family court sentenced Pecpec to a consecutive sentence based on the conduct set forth in Exhibit 17. However, the record does not support an inference that the jury found Pecpec guilty on Count 13 based specifically on the conduct memorialized in Exhibit 17, and thus the sentence was improper.

Accordingly, we vacate Pecpec's sentence on Count 13 and remand for re-sentencing. We affirm the family court's June 4, 2010 Amended Judgment of Conviction and Sentence in all other respects.

## I. Background

On April 15, 2010, the State charged Pecpec by way of complaint with 25 counts of Violation of an Order for Protection, in violation of Hawai'i Revised Statutes (HRS) § 586–11(a)(1)(A).[2] The language of each count was identical, except for the date of the alleged violation:

> On or about [date], in the City and County of Honolulu, State of Hawaii, [Pecpec] did intentionally or knowingly violate the Order of Protection issued in FC–DA No. 08–1–1887, filed on the 15th day of September, 2008, by the Honorable Linda S. Martell, Judge of the [family court], State of Hawai'i, pursuant to Chapter 586 of the [HRS], thereby committing the offense of Violation of an Order for Protection in violation of Section 586–5.5[[3]] and Section 586–11(a)(1)(A) of the [HRS].

Counts 1 through 6 alleged violations on October 19, 2009. Count 7 alleged a violation on October 22, 2009. Counts 8 through 15 and 18 through 22 alleged violations on November 6, 2009. Counts 16 and 22 through 25 alleged violations on November 7, 2009. Finally, Count 17 alleged a violation on November 8, 2009.[4]

2. HRS § 586–11(a) (Supp.2009) provides, in relevant part:
 (a) Whenever an order for protection is granted pursuant to this chapter, a respondent or person to be restrained who knowingly or intentionally violates the order for protection is guilty of a misdemeanor. A person convicted under this subsection shall undergo domestic violence intervention at any available domestic violence program as ordered by the court. The court additionally shall sentence a person convicted under this subsection as follows:
 (1) For a first conviction for violation of the order for protection:
 (A) That is in the nature of non-domestic abuse, the person may be sentenced to a jail sentence of forty-eight hours and be fined not more than $150; provided that the court shall not sentence a defendant to pay a fine unless the defendant is or will be able to pay the fine[.]

3. HRS § 586–5.5(a) (Supp.2001) provides, in relevant part:

> If, after hearing all relevant evidence, the court finds that the respondent has failed to show cause why the order should not be continued and that a protective order is necessary to prevent domestic abuse or a recurrence of abuse, the court may order that a protective order be issued for a further fixed reasonable period as the court deems appropriate.

4. Although nothing in the language of each count distinguished the counts involving the same date from one another, the caption of the complaint correlated each count with a different police report number. The corresponding police reports, which are contained in the record on appeal, state the date and time of each alleged violation and specify whether each violation occurred by way of voicemail or text message. However, it does not appear that this correlation between the police reports and the charged counts was presented to the jury, and the police reports were not admitted into evidence.

## A. Trial

The complaining witness ("CW") testified that she and Pecpec were married from 1997 to 2007 and had five children together. CW testified that, on September 15, 2008, she obtained an Order for Protection against Pecpec, which was effective until September 2013. A redacted copy of the September 15, 2008 Order for Protection was admitted into evidence.[5] The Order prohibited Pecpec from, inter alia, contacting CW by phone or text message, but allowed for "LIMITED contact . . . for the purpose of" "attending courtroom proceedings" and "service of legal documents by mail or through a process server."

CW testified that Pecpec left her six voicemails on her office telephone on October 19, 2009. CW could not remember the exact times of the voicemails, but stated that they were left "from 10:00 in the morning, on" "during business hours." CW could not remember the exact content of the voicemails but testified that the voicemails discussed "various, different things[,]" such as speculating that she was not answering her work phone because she had been out late and that their oldest son "really wasn't his and that's probably why his son wanted to change his last name." CW recorded the voicemails but did not provide the recordings to the prosecutor because she "wrote down whatever was said on the message."

CW testified that she also received voicemails from Pecpec on October 22, November 6, November 7 and November 8, 2009. CW saved these voicemails, recorded them, and gave the recordings to the prosecutor's office. Redacted versions of the recordings were admitted into evidence over defense counsel's objection as State's Exhibits 13 through 23. CW testified that Exhibit 23 contained a voicemail she received on October 22, 2009. CW testified that Exhibits 15 through 22 contained voicemails she received on November 6, 2009 as follows: Exhibit 15 was received after 1:00 p.m.; Exhibit 16 was

received at 1:25 p.m.; Exhibit 17 was received at 1:28 p.m.; Exhibit 18 was received at 1:46 p.m.; Exhibit 19 was received at 1:50 p.m.; Exhibit 20 was received at 1:51 p.m.; Exhibit 21 was received at 2:05 p.m.; and Exhibit 22 was received at 3:40 p.m. CW testified that Exhibit 14 contained a voicemail she received on November 7, 2009 at "about" 2:15 p.m. Exhibit 13 contained a voicemail she received on November 8, 2009 at "about 5:00 p.m."

The recordings were published to the jury and transcribed as follows [6]:

**[Exhibit 23, October 22, 2009:]** (Indiscernible). But you know, [CW], that's what you gotta (indiscernible), okay. (Indiscernible) fucking have any love for me or whatsoever in front of the kids, because you never did. When I think of the—fucking our past (indiscernible), when I think about fucking when you gave me a special gift, you probably wouldn't even remember what you gave me; but I still do (indiscernible).

. . . .

**[Exhibit 22, November 6, 2009:]** What? You not going to answer the phone now? Huh? Don't worry, I said. The (indiscernible) is getting clearer and clearer and clearer. That's why you spend so much time at Ko Olina with your time-shares with (indiscernible) of people. That's why you spend so much time at Ala Moana Hotel with the bunch of people that you fucking working with, okay.

Oh, if I were you, I would have your friend cancel the fucking reservation November 17th, that whole week, (indiscernible).

. . . .

**[Exhibit 21, November 6, 2009:]** You know, I don't know if you remember about when you had asked me about how I wen' ask about your job.

5. The redactions removed, inter alia, language referencing domestic abuse by Pecpec against CW.

6. The State introduced each voicemail by stating the exhibit number and the alleged date of the voicemail. The exhibit number and the date

provided by the State appear in brackets in the passage quoted above.

Based on CW's testimony regarding the exhibit numbers, *supra*, it appears the voicemails for November 6, 2009 were not published to the jury in the order in which they were allegedly received.

So what do you think about your new job?

. . . .

[Exhibit 20, November 6, 2009:] July 26, July 28, (indiscernible) July 24, or July 23rd. (Indiscernible) fuck you.

. . .

[Exhibit 19, November 6, 2009:] You know, bottom line for me (indiscernible), yeah, just because I call you up, it doesn't necessarily mean I wen' smoke, okay. I remember this, now. I keep telling you guys that when (indiscernible) did something to (indiscernible) and his wife, he wasn't high. I keep telling you (indiscernible), the sisters, and it was (indiscernible), okay. (Indiscernible). That's why to me (indiscernible).

You already know what she did in the past about this relationship, so—everybody can see that already, everybody except the fucking guys that, you know, kiss ass for the pussy. Because why? The fuckers no (indiscernible).

. . . .

[Exhibit 18, November 6, 2009:] (Indiscernible), fucking (indiscernible), okay. (Indiscernible) make me go to the Hawaiian National Bank? Because that's where (indiscernible). (Indiscernible.)

. . . .

[Exhibit 17, November 6, 2009:] (Indiscernible). (Indiscernible) fucking (indiscernible). (Indiscernible) because all those fuckers are sorry asses, too, okay. But they cannot afford to get divorced from their wife because the wife will take everything, okay.

(Indiscernible) going on, [CW]. I told you, when you sent me to jail, you only made me stronger. Stronger by what? Meeting the people that I needed to meet, okay. That's why, I go in again, and if I stay in two years, more fucking strong I come, okay. On the outside I'm already solid. Inside, I even more solid, okay. (Indiscernible) the kind of thing that's comes to—to me. (Indiscernible) I hope you understand that, okay.

Now, the police help you out. Why? Because (indiscernible) helping you. (Indiscernible) helping you because why (indiscernible), okay, in Alewa Heights, all those things, okay, and all those people

have contact. But you know what? Like I said, sometimes (indiscernible) really help because there's a price to pay for all those kids. (Indiscernible). Why? They have no fucking (indiscernible).

. . . .

[Exhibit 16, November 6, 2009:] Like I said, [CW], I'm not (indiscernible) to kill you. I'm not doing nothing wrong to you. I brought up (indiscernible) name. (Indiscernible) ways to hurt you. No, no, no, no. (Indiscernible) saying that, okay. But all I'm saying is, that, just because I talk the way I talk doesn't mean I did what you accusing me of for the fucking past six, seven years, okay. But maybe it was you that was smoking; that's why you had to make yourself feel good, okay. But like I said, [CW], you will continue to deny me. Why? Because you cannot remember all the lies you have said to me. (Indiscernible).

Oh, this is what I wanted to say: Like the pharmaceutical company, with the insurance, with (indiscernible), and with your doctors and you as a patient, it is the way they work around. And that's why these people all hang out and drink together. Now, the bank, construction workers, homeowners, the subcontractors and everything, that's why they all party together. Why? Because that's the way they going get their money. Or else there wouldn't be any (indiscernible) for anybody. You see? That's why you been doing (indiscernible). (Indiscernible) government's money, just to fucking (indiscernible) and they find themself in the bedroom fucking, making people's life miserable.

Like I said, (indiscernible). I'm just showing her family and Randall, too—because Randall's a (indiscernible), too, okay. I hope you see that. (Indiscernible). And if they get girlfriend, I say, Sorry, but you cannot come around; I'm not going to destroy your relationship with your other—your girlfriend. I don't want to be part of that. My friends already wen' use me to do—destroy mine, okay. I'm not that kind of person (indiscernible). If you want destroy your relationship with your

girlfriend, you do it on your own. Don't do (indiscernible) on my time.

. . . .

[**Exhibit 15, November 6, 2009:**] (Indiscernible). Remember you said that you wanted to purchase? Yeah? (Indiscernible) [CW], because of you, using my money, okay. Since when you (indiscernible) concerned? You're (indiscernible) gone for two days, okay. Go hide in Ala Moana Hotel. Go hide in the apartment (indiscernible). (Indiscernible) you're a sick person, I told you.

I'm going to let you know, I'm going to do one other—I'm going to contest the TRO again, okay. I'm also going to contest the Divorce Decree again, okay. And this time I'm going to let the kids talk in court. Those are the kids (indiscernible) subpoenaed. I'm going to subpoena everybody that knows what's going on already, okay. I'm also going to bring out about the bank statements and our deposits and all those things. (Indiscernible) judge wen' ask about what I do, what I did, okay. I didn't want to talk about it because it involves you; but you're forcing me to do it, okay. (Indiscernible). (Indiscernible) aren't going to help you, okay. At least (indiscernible) support, [CW]. This is something that you always talked about to me. Now that I have it, you don't want it? Why? Why? Because you fucked up. Fuck that, you know. Fuck it. If this is the way you're going to raise the kids, don't involve me with them, okay. Why don't you go find a father that you (indiscernible) with them.

. . . .

[**Exhibit 14, November 7, 2009:**] I'm sorry to say this, but you turned off your fucking phone on me, on nobody else, yeah. (Indiscernible), okay.

. . . .

[**Exhibit 13, November 8, 2009:**] (Indiscernible)? (Indiscernible), yeah, when you were fucking (indiscernible). (Indiscernible).

(Internal quotation marks omitted).

CW testified that she also received text messages from Pecpec on November 6 and November 7, 2009. CW saved these messages and forwarded them to another cell phone with a larger screen, and then took digital photographs of the messages and gave the photographs to the prosecutor's office. The photographs were admitted into evidence over defense counsel's objection as State's Exhibits 5 through 12. CW testified that Exhibits 5 through 9 contained text messages she received on November 6, 2009 as follows: Exhibit 5 was received at approximately 9:40 p.m.; Exhibit 6 was received at 9:53 p.m.; Exhibit 7 was received at 10:21 p.m.; Exhibit 8 was received at 10:33 p.m.; and Exhibit and 9 was received at 10:47 p.m. CW testified that Exhibits 10 through 12 contained text messages she received on November 7, 2009 as follows: Exhibit 10 was received at 3:36 a.m.; Exhibit 11 was received at 3:47 a.m.; and Exhibit 12 was received at 5:42 a.m.

The photographs of the text messages were published to the jury. The text messages read as follows [7]:

[**Exhibit 5, November 6, 2009**] FWD: No need look for me i got u on G P S i also

[**Exhibit 6, November 6, 2009**] FWD: Must be nice to see men or lesbians jump to help u with ur problem using the pussy i ate n fuck. Hard to replace me in the way i ate n fuck u

[**Exhibit 7, November 6, 2009**] FWD: How's the Shack n the small men mentality cops. I hope the balls they have can give me a challenge just ask Maribel if i'm scared

[**Exhibit 8, November 6, 2009**] FWD: I been doing my homework. The guy's u have can't protect themselves bcuz i know who they r. N cars they drive n license plate how's that. I'm fm. 94 block

[**Exhibit 9, November 6, 2009**] FWD: U can alway's at the bus stop, running, or riding a bike, or riding in a car tinted next to u. Watching u give head that's nuts.

[**Exhibit 10, November 7, 2009**] FWD: Same scenerio every week not home to care for the kids yet she forces them to go

---

7. The prosecution marked each exhibit with the date CW allegedly received the text message.

That date appears in brackets in the passage quoted above.

home so she can get eaten n fuck all night. That's y u did I U D n not get preg

[**Exhibit 11, November 7, 2009**] FWD: So silly u think u can handle me but cannot handle me fucking u. 3 am not home doesn't look good to C P S

[**Exhibit 12, November 7, 2009**] FWD: I told u i hope u r not helping to destroy a family by staying out all night with ur friends bcuz some is not good in breaking up

CW testified that she did not give Pecpec permission to contact her by phone or text message on any of the alleged dates. CW testified that the voicemails she received from Pecpec on October 19 and 22, 2009 made her feel "[n]ervous." in response to these calls, CW called Pecpec because she was concerned that the voicemails indicated Pecpec knew her whereabouts. CW testified that the conversations mostly involved Pecpec "accusing [her] of something," and that she "would just listen sometimes and try to be calm if he sounded agitated." CW testified that she told Pecpec to stop calling her "because this is a violation." She testified that she contacted Pecpec "because [she] was scared and [ ] wanted to say, you know, What is it that you want?"

CW testified that the voicemails and text messages she received from Pecpec on November 6, November 7, and November 8, 2009 made her feel "[n]ervous and scared." CW again contacted Pecpec during this time frame because "some of the texts entailed GPS" or other indications that Pecpec knew her whereabouts. CW testified that she contacted Pecpec to "have him stop calling [her]" and to "get an idea of where he was."

On cross-examination, CW testified that Pecpec filed a motion to dissolve the Order for Protection on May 29, 2009, and that a hearing on the motion was scheduled for October 19, 2009 at 8:30 a.m. Pecpec did not appear at the hearing. CW could not recall whether Pecpec called her on October 19, 2009 to ask about the hearing, but stated that she would not have included those phone calls in her complaint because "it could have just been regarding the court."

Defense counsel asked CW regarding the content of the voicemails she received on October 19, 2009 that were the subject of her complaint. CW stated that she wrote the content of the voicemails on the statement she made to the police. However, upon being shown her statement, CW testified that she did not write the content of the voicemails on her statement.

CW also testified that, around November 6, 2009, she had a conversation with one of her sons ("AP") in which she threatened to call the police because Pecpec was with the children even though he was prohibited from having contact with them. On redirect, CW testified that she did not report this incident to the police because she "didn't want the kids to see their dad getting arrested, and they came home[.]"

AP, who is Pecpec and CW's son, testified as a witness for the defense. AP testified that, on November 6, 2009, he was at his grandparents' house when CW called. CW found out that Pecpec was also at the house. Pecpec then left the house, but CW thought Pecpec was still there and told AP to come home. AP told CW that he did not want to go home, and CW told AP that she would call the police if he did not come home. AP testified that he wanted to stay at his grandparents' house because he wanted to see his dad. AP did not leave his grandparents' house and instead stayed there for several hours. Pecpec eventually returned and talked with CW on the phone.

Pecpec testified in his own defense. With regard to October 19, 2009, Pecpec testified that he was late for the hearing on his motion to dissolve the Order for Protection and therefore missed the hearing. Pecpec stated that he called CW later on October 19, 2009 to discuss the hearing and to explain that he had missed the hearing because he was suffering from a kidney stone the previous night. Pecpec testified that the call lasted approximately 10 to 15 minutes and was solely concerned with the hearing. After that call, he received a call from CW but could not answer it because he was on the phone with someone else. He then left CW three voicemails on October 19, 2009 at 10:14 a.m., 10:24 a.m., and 10:26 a.m., because she had asked him to call her back. All three of the voicemails concerned the court hearing. Pecpec testified that CW called him back after these

voicemails. Pecpec denied calling CW on October 19, 2009 at 12:08 p.m. or 12:20 p.m. and stated that he was on the bus at that time.[8] Pecpec also denied calling CW on October 22, 2009.

Pecpec testified regarding an incident at his parents' house on November 6, 2009. Pecpec's children came to the house and, after he said "hi" to them, he left. He then received a call from his son, AP, who was crying. AP told Pecpec that CW was going to call the police if the children didn't go home. At approximately 1:00 p.m., while still on the phone with AP, Pecpec received a call from CW, who asked him to tell the children to go home. Pecpec testified that he then went "back and forth" between calls from CW and AP until he got back to the house. After arriving at the house, CW "kept calling, leaving [ ] messages to call her back."

With regard to the November 6, 2009 voicemails, Pecpec testified that he "might have" left CW a voicemail at 1:16 p.m., asking her to "[h]ang on" because he was busy. When asked about the voicemail contained in Exhibit 22, which defense counsel identified as allegedly being left on November 6, 2009 at 1:16 p.m., Pecpec testified that he did not leave that voicemail on November 6, 2009, but "maybe a different time." [9] Pecpec testified that he called CW at 1:25 p.m. to ask her to let the children stay at his parents' house, but she refused. When asked about the voicemail contained in Exhibit 21, which defense counsel identified as allegedly being left on November 6, 2009 at 1:25 p.m., Pecpec testified that the voicemail contained in Exhibit 21 "never happened[.]" Pecpec also testified that the voicemails contained in Exhibits 19, 18, 17, 16 and 15 were not made on November 6, 2009.[10]

Pecpec talked with CW at approximately 9:30 p.m. on November 6, 2009 after his children returned home. Pecpec testified that CW stated, "You know what? Fuck you. More better I look for you myself and shoot you, you fucker."

Pecpec testified that he did not call CW on November 7, 2009 at 2:15 p.m., and did not have a recollection of the voicemail contained in Exhibit 14. Pecpec testified that he did not call CW on November 8, 2009 at 5:15 p.m., and that the voicemail contained in Exhibit 13 was made at a previous time. Pecpec also testified that he did not leave the voicemail contained in Exhibit 23 on October 22, 2009, but rather at a previous time. Pecpec did not state when these voicemails were left, but did not testify that he left these voicemails prior to the September 15, 2008 effective date for the Order for Protection.

With regard to the text messages on November 6, 2009, Pecpec testified that he remembered writing the message CW allegedly received at 9:40 p.m., but did not remember sending it. The message was written in response to CW's threatening Pecpec over the phone. CW responded to the text message by writing, "Fuck you." Pecpec also remembered writing the message CW allegedly received at 9:53 p.m., but did not remember sending it. Pecpec testified that he did not send CW text messages on November 6, 2009 at 10:21 p.m., 10:33 p.m., or 10:47 p.m., and that the text messages contained in Exhibits 7 through 9 were made at a different time.

With regard to the text messages on November 7, 2009, Pecpec testified that the text message contained in Exhibit 10 was not made on November 7, 2009, but was made the following week. Pecpec also testified that the text messages contained in Exhibits 11 and 12 were not made on November 7, 2009.

On cross-examination, Pecpec testified that he received the Order for Protection and knew that he was prohibited from contacting or threatening CW. Pecpec confirmed that he

---

**8.** As noted, CW did not testify to the exact times of the voicemails she received on October 19, 2009. *See supra*, p.6. However, the times Pecpec referred to in his testimony correspond with the times listed in the police reports concerning the October 19, 2009 violations. *See supra*, n. 4.

**9.** During Pecpec's testimony, defense counsel appeared to identify the conduct described in Exhibit 22 as relating to 1:16 p.m.; Exhibit 21 as

relating to 1:25 p.m.; Exhibit 19 as relating to 1:46 p.m.; Exhibit 18 as relating to 1:50 p.m.; Exhibit 17 as relating to 1:51 p.m.; Exhibit 16 as relating to 2:05 p.m.; and Exhibit 15 as relating to 3:40 p.m. However, this is inconsistent with CW's testimony regarding the timing of the voicemails.

**10.** Defense counsel did not question Pecpec regarding the voicemail contained in Exhibit 20.

left CW the voicemails that had been played for the jury.

CW was called as a rebuttal witness for the State. Regarding the incident involving AP, CW testified that she did not tell Pecpec, "More better I look for you myself and shoot you myself[.]"

During the settling of jury instructions, neither Pecpec nor the State requested a specific unanimity instruction.[11] The family court instructed the jury that "[a] verdict must represent the considered judgment of each juror, and in order to return a verdict, it is necessary that each juror agree thereto. In other words, *your verdict must be unanimous.*" (Emphasis added). The family court also instructed the jury with regard to the elements of the offense. With regard to Counts 1 through 17, the family court instructed the jury 17 separate times, as follows, changing only the count number and the date:

As to Count [count number] of the Complaint, [Pecpec] is charged with the offense of Violation of An Order for Protection.

A person commits the offense of Violation of An Order for Protection if he intentionally or knowingly engages in conduct which is prohibited by an Order for Protection issued by a Judge of the Family Court that was then in effect. There are four material elements of the offense of Violation of An Order for Protection, each of which the prosecution must prove beyond a reasonable doubt.

These four elements are:

1. That on or about [date] in the City and County of Honolulu, State of Hawai'i an Order for Protection issued by a Judge of the Family Court pursuant to [c]hapter 586 of the [HRS], was in effect, prohibiting [Pecpec] from engaging in certain conduct, namely contacting or threatening [CW], by either telephone or recorded message; and

2. That on or about [date], in the City and County of Honolulu, State of Hawai'i, [Pecpec] intentionally or knowingly engaged in certain conduct, namely contacting or threatening [CW] by either telephone or recorded message, which was conduct prohibited by the Order for Protection; and

3. That [Pecpec] knew, at the time, that such conduct was prohibited by the Order for Protection; and

4. That [Pecpec] was given notice of the Order for Protection prior to engaging in such conduct by having been personally served with the Order for Protection.

The prosecution must prove beyond a reasonable doubt that [Pecpec] acted intentionally or knowingly as to each element of the offense.

With regard to Counts 18 through 25, the family court provided the same instruction as for the previous counts, but replaced the phrase "by either telephone or recorded message" with the phrase "by text message." The family court repeated this instruction 8 separate times, changing the count number and date.

In instructing the jury regarding the form of its verdict, the family court repeated the following instruction 25 times, changing the count number with each repetition:

In Count [count number] of the Complaint, as to Defendant ORLANDO PECPEC, you may bring in either one of the following verdicts:

1. Not guilty; or

2. Guilty as charged of Violation of An Order for Protection.

---

11. Hawai'i Pattern Jury Instructions—Criminal (HAWJIC) provides the following "generic" unanimity instruction:

The law allows the introduction of evidence for the purpose of showing that there is more than one [act][omission][item] upon which proof of an element of an offense may be based. In order for the prosecution to prove an element, all twelve jurors must unanimously agree that [the same act][the same omission] [possession of the same item] has been proved beyond a reasonable doubt.

HAWJIC Instruction 8.02 (brackets in original).

Although the HAWJIC refers to this instruction as a "generic" unanimity instruction, this type of instruction is referred to as a "specific" unanimity instruction in our caselaw. *See, e.g., State v. Arceo,* 84 Hawai'i 1, 33, 928 P.2d 843, 875 (1996) (identifying a "specific" unanimity instruction as one that "advises the jury that all twelve of its members must agree that the same underlying criminal conduct has been proved beyond a reasonable doubt").

*Your verdict must be unanimous.*

(Emphasis added).

In closing argument, the State argued that CW's testimony was more credible than that of Pecpec regarding the dates and times of the alleged voicemails and text messages. The State also connected the charged counts to the dates and exhibits as follows:

Now, you have before you 25 counts and numerous dates of incidents. Let's go over it quickly to try to break it down and make it a little easier.

Okay. So we're talking about 25 counts of Violation of an Order for Protection. We know that they fall into two categories—voice mails and text messages. The voice mails would be your first 17 counts, Counts [1] to [17]. The text messages would be your next eight counts, Counts [18] to [25].

Now, let's look first at the voice mails. The voice mails are grouped in terms of the dates of incident. Counts [1] through [6] are from October 19, 2009; Count [7] is from October 22; Counts [8] to [15] are November 6; Count [16] from November 7; and Count [17] is from November 8.

Now, you listened to voice mails. These voice mails are also associated with these dates. Exhibit 23 is the voice mail from October 22; Exhibit[s] 15 to 22 are from November 6; Exhibit 14 is from November 7; Exhibit 13 is from November 8.

Switching now to the text messages. Counts [18] to [25], they are also grouped in terms of the dates of incident. Counts [18] to [22] are from November 6; Counts [23] to [25] are from November 7. For each of these text messages there are exhibits. Exhibits 5 through 9 are the text messages from November 6; and Exhibits 10 to 12 are the text messages from November 7.

Defense counsel argued that the voicemails on October 19, 2009 concerned the hearing to dissolve the Order for Protection. Defense counsel also argued that CW was not credible, and that CW continued to contact Pecpec between November 6 and November 8, 2009. Defense counsel also pointed out that CW did not include the date and time stamp on her recordings of the voicemails, and that Pecpec testified that the voicemails were from another time.

In rebuttal closing, the State argued:

Ladies and gentlemen, the Order for Protection prohibits him, prohibits [Pecpec] from contacting [CW], threatening her. *State has shown beyond a reasonable doubt that he did just that 25 times.*

(Emphasis added).

The jury found Pecpec not guilty on Counts 1 through 6, i.e., the voicemails on October 19, 2009. The jury found Pecpec guilty on the remaining 19 counts.

At sentencing, the State recommended that Pecpec be sentenced to a one-year term of incarceration on each count, with four of the sentences to run concurrently. The State did not identify any specific counts for which concurrent sentencing should be imposed, but stated that it was "looking at a sentence of five years total[.]" Defense counsel requested only that Pecpec be given credit for time served. The family court then inquired regarding the count to which Exhibit 17 related:

THE COURT: Okay. Counsel [for the State], Exhibit 17, November 6, 2009, turning your attention to the transcripts, is that Count [10]?

[STATE]: Exhibit 17 is Count [13].

THE COURT: Exhibit 17 is—is Count [13]?

[STATE]: Yes, your Honor.

THE COURT: Okay. Do you agree, counsel for Defense?

[DEFENSE]: I'm sorry. I didn't bring my complete file.

THE COURT: Okay. No problem.

Do you wish to have your client address the [c]ourt at this point?

Pecpec allocuted, and the family court subsequently reviewed Pecpec's history of violence against CW, his history of drug use, his past convictions for harassment and violations of an order for protection, and the number of convictions in this case. The family court sentenced Pecpec to a one-year term of incarceration on each count, to run concurrently, with the exception of Count 13 for which the sentence was to run consecu-

tive to the remaining counts. As to the sentence on Count 13, the court explained:

[T]he [c]ourt takes particular note that [Pecpec] in this conversation, which is Count [13], which I believe is Exhibit 17, which was recorded on 11—November 6, 2009, [Pecpec] blames the victim for sending him to jail and that she's—and that because he went to jail because of her it made him stronger. And then he goes on to indicate to her that there's a price to pay for all these things, which the [c]ourt interprets in its context to be a threat to the victim's life. The [c]ourt takes this serious [sic]. The [c]ourt finds in Count [13] that the circumstances of this case, as well as the facts and circumstances as the [c]ourt has already indicated [with regard to Pecpec's history of violence against CW and his violations of other protective orders], warrants that [Pecpec] be sentenced in Count [13] to one year consecutive to the other counts.

On May 4, 2010, the family court issued a Judgment of Conviction and Sentence.[12] Pecpec filed his Notice of Appeal on May 13, 2010. On June 4, 2010, the family court issued its Amended Judgment of Conviction and Sentence, convicting Pecpec on counts 7 through 25 and sentencing him to a one-year term of incarceration on each count, to run concurrently, with the exception of Count 13 for which the sentence was to run consecutive to the remaining counts.

## B. Appeal

In his opening brief, Pecpec argued that the family court should have given the jury a specific unanimity instruction because "[t]he State presented evidence of more than one act which could support conviction in each count of the complaint, and its election was not clear on the record." (Citing *Arceo*, 84 Hawai'i at 32–33, 928 P.2d at 874–75 (1996)) (holding that, where the State presents evidence of multiple instances of misconduct but charges only one, the State must elect which act underlies the charge or the trial court must issue a specific unanimity instruction).

Pecpec contended that the verdicts "were not supported by unanimous agreement upon a single act constituting the offense in each count[,]" and accordingly violated his right to a unanimous verdict under the United States and Hawai'i constitutions. Pecpec acknowledged that a Powerpoint presentation used during the State's closing argument contained "slides with [sic] connect Counts of the Complaint to particular exhibits identified by date and number." However, Pecpec argued that the Powerpoint slides "should not be construed as an election" because they are not "clearly referenced or entered in the record[.]" [13]

Pecpec also challenged his consecutive term sentence on Count 13 on the ground that the jury verdict was not unanimous. Pecpec stated that the family court "unilaterally assigned to this particular count[ ] the conduct portrayed in State's Exhibit 17."

In its answering brief, the State asserted that it "introduced 19 separately identified exhibits that memorialized 19 distinct contacts [Pecpec] made with [CW] as the proof he committed the 19 different offenses charged" in Counts 7 through 25. Therefore, the State argued, *Arceo* was inapplicable because that case dealt with multiple acts underlying a single charged offense, rather than an equal number of acts and counts. The State also contended that "any uncertainty with regard to the unanimity of the jury's guilty verdicts for the [voicemail] counts is erased by" Pecpec's admission on cross that he left the voicemails that were played in court. As to the consecutive term sentence on Count 13, the State argued that, because the jury unanimously found Pecpec guilty of the violation memorialized in Exhibit 17, and because Pecpec admitted to leaving the voicemail contained in Exhibit 17, the imposition of a consecutive term sentence based on that exhibit did not constitute an abuse of discretion.

Pecpec reiterated in his reply brief, that "each [count] could [have been] supported by

---

12. This judgment did not state whether Pecpec was convicted of any charges.

13. The State did not address the Powerpoint slides, and did not argue that it elected the spe-

cific exhibit that supported each count. Moreover, as noted by Pecpec, the Powerpoint slides are not contained in the record on appeal. Accordingly, we do not consider them.

more than one of the acts alleged" and that the State did not "establish or even contend that the exhibits of November 6, 2008 are connected to any specific count in the complaint." Pecpec further argued that "it is insufficient to present a number of exhibits to prove the same amount of counts, expecting that the jury attributes the exhibits, in chronological or numerical order, to the counts in sequence."

In a summary disposition order signed by Judges Nakamura and Ginoza, a majority of the Intermediate Court of Appeals (ICA) held that the family court did not err by not providing a specific unanimity instruction. *Pecpec*, 2011 WL 2037679, at *1. Specifically, the majority concluded that:

> The jury was afforded sufficient guidance to know what it had to conclude in order to convict on the multiple counts asserted against Pecpec, and there is no genuine possibility of jury confusion given the record in this case. The prosecution presented evidence and asserted throughout this case that Pecpec committed a total of twenty-five acts (voice mails or texts) which were the basis for the twenty-five counts of violating a Protective Order that prohibited Pecpec from contacting the complainant, his ex-wife.

*Id.*

The majority also noted that Pecpec admitted leaving the voicemails that were played in court; the family court instructed the jury in various ways that its verdict must be unanimous; and there was a one-to-one relationship between the number of counts and the number of exhibits, which distinguished this case from *Arceo*. *Id.* at *2–5. Finally, the majority noted that "for Counts 7–25, the jury convicted on all the counts for dates on which multiple counts were charged. For this to occur, the jury must have unanimously found that Pecpec engaged in each of the prohibited contacts reflected in the exhibits." *Id.* at *5. Accordingly, the ICA held that Pecpec was not entitled to relief.[14] *Id.*

The majority also rejected Pecpec's arguments concerning the consecutive term sentence on Count 13, noting that the family court conferred with both counsel before relying on Exhibit 17, and the voicemail contained in Exhibit 17 "was an act by Pecpec upon which the jury unanimously agreed to convict." *Id.* Accordingly, the majority affirmed the family court's judgment. *Id.*

Judge Reifurth concurred in part and dissented in part.[15] *Id.* at *5–6. The dissent agreed with the majority that no specific unanimity instruction was necessary for counts alleging violations on dates for which there was only one voicemail or text message, i.e., Count 7 (a voicemail on October 22, 2000), Count 16 (a voicemail on November 7, 2009), and Count 17 (a voicemail on November 8, 2009). *Id.* at *7. However, the dissent would have required a specific unanimity instruction for dates where multiple violations of the same type were charged, i.e., Counts 8–15 (voicemails on November 6, 2009), Counts 18–22 (text messages on November 6, 2009), and Counts 23–25 (text messages on November 7, 2009). *Id.* The dissent expressed concern that some of the jurors may have believed that a single act supported multiple counts of the complaint. *Id.* The dissent illustrated this concept as follows:

> For example, Juror 1 might conclude that Exhibit 15 (voice mail received November 6, 2009 at 1:00 p.m.) supports conviction on Count 8 and that Exhibit 16 (voice mail received November 6, 2009 at 1:25 p.m.) supports conviction on Count 9, while Juror 2 does not believe that Exhibit 15 supports a conviction at all, but that Exhibit 16 supports a conviction on both Counts 8 and 9. Under those circumstances, [Pecpec] is denied his constitutional right to a unanimous verdict on Count 8 under article I, sections 5 and 14 of the Hawai'i Constitution.

*Id.* (footnotes omitted).

Accordingly, the dissent would have vacated the family court's judgment as to the convictions on Counts 8–15 and 18–25 and remanded for further proceedings. *Id.* at *9.

---

14. Despite this holding, the majority noted that, had the State specified the time or content of the voicemails and text messages for each count of the complaint, it would have eliminated any issues regarding unanimity. *Id.* at *5.

15. For ease of reference, we refer to the concurring and dissenting opinion as the "dissent."

The ICA filed its judgment affirming the family court's Amended Judgment of Conviction and Sentence on June 7, 2011. Pecpec timely filed his application on July 29, 2011, in which he raises the following questions:

Did the [ICA] err by violating [Pecpec's] right to unanimous jury verdict guaranteed under Amendment VI to the U.S. Constitution and Art. I, § 14 of the Constitution of the State of Hawai'i, in affirming [Pecpec's] convictions where no Specific Unanimity Instruction was given to the jury and the State did not make an election of counts?

Did the ICA err in violating [Pecpec's] right to due process Amendment VI to the U.S. Constitution and Art. I, § 14 of the Constitution of the State of Hawai'i, Equal Protection Under the Law Amendments V and XIV to the U.S. Constitution and Art. I, §§ 5 and 14 of the State of Hawaii Constitution and cruel and unusual punishment Amendment VIII th [sic] the U.S. Constitution and Art. I, § 12 of the Constitution of the State of Hawaii by affirming consecutive sentence predicated on verdicts which were not unanimous?

(Internal brackets omitted).

The State did not file a response.

## II. Standards of Review

### A. Omission of Jury Instructions

■■■■ When jury instructions or the omission thereof are at issue on appeal, the standard of review is whether, when read and considered as a whole, the instructions given are prejudicially insufficient, erroneous, inconsistent, or misleading.

Erroneous instructions are presumptively harmful and are a ground for reversal unless it affirmatively appears from the record as a whole that the error was not prejudicial.

*Arceo,* 84 Hawai'i at 11, 928 P.2d at 853 (internal quotation marks, brackets, and citations omitted); *see also State v. Nichols,* 111 Hawai'i 327, 337, 141 P.3d 974, 984 (2006) ("[O]nce instructional error is demonstrated, we will vacate, without regard to whether timely objection was made, if there is a reasonable possibility that the error contributed to the defendant's conviction, *i.e.,* that the

erroneous jury instruction was not harmless beyond a reasonable doubt.").

### B. Sentencing

■■■■ A sentencing judge generally has broad discretion in imposing a sentence. The applicable standard of review for sentencing or resentencing matters is whether the court committed plain and manifest abuse of discretion in its decision. Factors which indicate a plain and manifest abuse of discretion are arbitrary or capricious action by the judge and a rigid refusal to consider the defendant's contentions. And, generally, to constitute an abuse it must appear that the court clearly exceeded the bounds of reason or disregarded rules or principles of law or practice to the substantial detriment of a party litigant. *State v. Rauch,* 94 Hawai'i 315, 322, 13 P.3d 324, 331 (2000) (internal quotation marks, brackets, and citations omitted).

## III. Discussion

Pecpec argues that his convictions on Counts 8–15, 18–22 and 23–25 were obtained in violation of his right to a unanimous verdict because the State did not elect which exhibits corresponded to which counts, and the family court did not give the jury a specific unanimity instruction. Pecpec also argues that his consecutive sentence on Count 13 violates his constitutional rights because it was "impossible to know" whether Exhibit 17 corresponded to Count 13.

As set forth below, this court held in *Mundon* that a specific unanimity instruction is required where multiple counts are supported by the same number of acts, but the jury is not informed as to which act corresponds with each count. 121 Hawai'i at 354–55, 219 P.3d at 1141–42. The facts in *Mundon* are materially similar to those in the instant case. *See id.* at 354, 219 P.3d at 1141. Accordingly, the family court should have given a specific unanimity instruction, and its failure to do so was error. *See id.* at 354–55, 219 P.3d at 1141–42.

However, this error was harmless beyond a reasonable doubt because there is no "genuine possibility" that different jurors relied on different acts to support Pecpec's convictions. *Cf. id.* As discussed in detail infra,

the jury was presented with 19 exhibits, and convicted Pecpec on 19 counts that corresponded to the dates on which the conduct in those exhibits allegedly occurred. The presentation of the evidence, jury instructions, and arguments of both counsel made clear that there was a one-to-one relationship between counts and exhibits. Thus, there is no reasonable possibility that Pecpec was convicted on less than a unanimous verdict.

Nevertheless, we conclude that the family court abused its discretion in sentencing Pecpec to a consecutive sentence on Count 13, because the record does not reflect that the jury found Pecpec guilty on that count based specifically on the conduct memorialized in Exhibit 17.

### A. Although a specific unanimity instruction was required in the instant case, the family court's failure to give such an instruction was harmless beyond a reasonable doubt

 This court has stated that the right of an accused to a unanimous jury verdict is guaranteed by the sixth amendment to the United States Constitution[16] and article I, sections 5 and 14[17] of the Hawai'i Constitution. *Arceo*, 84 Hawai'i at 30, 928 P.2d at 872. In *Arceo*, this court addressed the right to a unanimous jury verdict, where a single count is supported by multiple acts. *Id.* at 32–33, 928 P.2d at 874–75. There, the defen-

dant was charged with one count of sexual assault in the third degree (Count 1) and one count of sexual assault in the first degree (Count 2). *Id.* at 2–3, 928 P.2d at 844–45. At trial, the complaining witness testified to multiple acts of sexual contact in support of Count 1, and multiple acts of sexual penetration in support of Count 2. *Id.* at 3, 928 P.2d at 845. The jury found the defendant guilty on both counts. *Id.* at 10, 928 P.2d at 852.

On appeal, the defendant argued that the trial court should have required the prosecution to elect the specific acts it was relying on in seeking convictions, or should have given the jury a specific unanimity instruction as to each count. *Id.* at 3, 928 P.2d at 845. This court agreed and held that:

> when separate and distinct culpable acts are subsumed within a single count charging a sexual assault—any one of which could support a conviction thereunder—and the defendant is ultimately convicted by a jury of the charged offense, the defendant's constitutional right to a unanimous verdict is violated unless one or both of the following occurs: (1) at or before the close of its case-in-chief, the prosecution is required to elect the specific act upon which it is relying to establish the "conduct" element of the charged offense; or (2) the trial court gives the jury a specific unanimity instruction, *i.e.*, an instruction that advises the jury that all twelve of its mem-

**16.** The sixth amendment to the United States Constitution provides:

> In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor, and to have the Assistance of Counsel for his defence.

**17.** Article 1, section 5 of the Hawai'i Constitution provides: "No person shall be deprived of life, liberty or property without due process of law, nor be denied the equal protection of the laws, nor be denied the enjoyment of the person's civil rights or be discriminated against in the exercise thereof because of race, religion, sex or ancestry."

Article 1, section 14 of the Hawai'i Constitution provides:

> In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial by an impartial jury of the district wherein the crime shall have been committed, which district shall have been previously ascertained by law, or of such other district to which the prosecution may be removed with the consent of the accused; to be informed of the nature and cause of the accusation; to be confronted with the witnesses against the accused, provided that the legislature may provide by law for the inadmissibility of privileged confidential communications between an alleged crime victim and the alleged crime victim's physician, psychologist, counselor or licensed mental health professional; to have compulsory process for obtaining witnesses in the accused's favor; and to have the assistance of counsel for the accused's defense. Juries, where the crime charged is serious, shall consist of twelve persons. The State shall provide counsel for an indigent defendant charged with an offense punishable by imprisonment.

bers must agree that the same underlying criminal act has been proved beyond a reasonable doubt.

*Id.* at 32–33, 928 P.2d at 874–75 (emphasis added).

*Arceo* is distinguishable from the instant case, because the holding was dependent on there being "separate and distinct culpable acts [ ] subsumed within a single count[.]" *Id.* In that circumstance, there is a "genuine possibility" that the jurors may not unanimously agree that the defendant committed the same act for each count. *Id.* (citation omitted). For instance, given two acts underlying a single count, some jurors may believe that the defendant engaged in one act but not the other, while other jurors may believe the opposite. In such a situation, the jury's verdict would not be unanimous as to either alleged act. In contrast, in the instant case, the State did not present evidence of multiple acts that could support conviction under each count. To the contrary, the 19 counts on which Pecpec was found guilty were supported at trial by 19 exhibits, with each exhibit reflecting a single act.

Accordingly, this case is more analogous to *Mundon,* where the defendant was charged with two counts of terroristic threatening in the first degree (TT1) based on two distinct acts, but the jury found him guilty on only one count. 121 Hawai'i at 354, 219 P.3d at 1141. There, this court noted that a unanimity instruction would not have been required under *Arceo,* but nevertheless recognized that "the jury should be given a specific unanimity instruction under additional circumstances." *Id.* at 353, 219 P.3d at 1140. This court stated its holding as follows:

Because the jury: (1) was not given a specific unanimity instruction with respect to the offense of TT1; (2) *was never informed which act committed by Mundon coincided with* counts *4 and 26, respectively;* and (3) convicted Mundon of one count of TT1 and acquitted him of the other, there is a genuine possibility that different jurors concluded that Mundon committed different acts. . . . Thus, there may not have been a unanimous verdict as to Mundon's conviction for TT1. Accordingly, we hold that, *to correct any potential confusion in this case, a specific unanimity instruction should have been given to ensure that the jury understood its duty to unanimously agree to a particular set of facts,* and that the trial court plainly erred in failing to provide such an instruction.

*Id.* at 354–55, 219 P.3d at 1141–42 (emphasis added) (citation, quotation marks and brackets omitted).

■ This court's holding in *Mundon* relied in part on the jury having acquitted the defendant of one of the charged counts.[18] Accordingly, it could be argued that a unanimity instruction is required under *Mundon* only where the defendant is found guilty on fewer counts than there are acts. However, a trial court cannot decide to give a unanimity instruction *after* the jury returns its verdict. Accordingly, the reasonable inference from *Mundon* is that a unanimity instruction is required in the circumstances of the instant case, i.e., where the number of acts charged is identical to the number of acts offered in evidence, but the jury is not informed as to which act coincides with each count.[19]

18. The dissent suggests that this court found a genuine possibility of juror confusion in *Mundon* solely because "the prosecution did not specify which act coincided with each count and the court did not give the jury a specific unanimity instruction." Dissenting opinion at 44, 276 P.3d at 613. However, as noted, this court relied on three factors in concluding that there was a genuine possibility for juror confusion in *Mundon:* (1) no unanimity instruction was given; (2) the jury was not informed as which act corresponded with each count; and (3) the jury *convicted Mundon on one count and acquitted him on the other. Id.* at 354–55, 219 P.3d at 1141–42.

19. In oral argument, the State argued that *State v. Keomany,* 97 Hawai'i 140, 34 P.3d 1039 (App.

2000), is applicable to the present case. *See* Oral Arguments before the Supreme Court (Oct. 6, 2011), *available at* http://www.courts.state.hi.us/courts/oral_arguments/archive/oasc30500.html. There, the defendant was indicted for and convicted on three counts of sexual assault in the first degree based on three distinct acts, and two counts of sexual assault in the third degree based on two distinct acts. *Keomany,* 97 Hawai'i at 143–45, 154, 34 P.3d at 1042–44, 1053. The ICA held that, under those circumstances, a specific unanimity instruction was not required. *Id.* at 154, 34 P.3d at 1053. The ICA distinguished *Arceo* because "there were more discrete acts than counts" in *Arceo,* but an equal number of acts and counts in *Keomany. Id.* In a concurring opinion, Judge Watanabe recognized that a spe-

In the instant case, the record does not reflect that the jury was informed of the act that corresponded to each count. Accordingly, under *Mundon*, the family court was required to provide the jury with a specific unanimity instruction, and its failure to do so constitutes error. 121 Hawai'i at 354–55, 219 P.3d at 1141–42. Erroneous instructions are a ground for reversal "unless it affirmatively appears from the record as a whole that the error was not prejudicial." *Id.* at 349, 219 P.3d at 1136 (quoting *Nichols*, 111 Hawai'i at 334, 141 P.3d at 981). "In that context, the real question becomes whether there is a reasonable possibility that error might have contributed to conviction. If there is such a reasonable possibility in a criminal case, then the error is not harmless beyond a reasonable doubt[.]" *Arceo*, 84 Hawai'i at 12, 928 P.2d at 854 (citations omitted).

█ The purpose of a specific unanimity instruction is to protect a defendant's constitutional right to a unanimous verdict, where jurors otherwise would not know they are required to unanimously agree that the defendant had committed the same act. *See Mundon*, 121 Hawai'i at 354–55, 219 P.3d at 1141–42. In the circumstances of the instant case, where the number of acts offered into evidence corresponds to the number of counts, the instruction guards against a potential lack of unanimity in the event the defendant is, for example, acquitted on one or more counts. *See id.* In the case of an acquittal, the one-to-one relationship between counts and acts is unclear, and there is therefore a "'genuine possibility' that different jurors concluded [the defendant] committed

different acts." *Mundon*, 121 Hawai'i at 354, 219 P.3d at 1141.

█ However, in the instant case, there is no "reasonable possibility" that the jurors did not unanimously agree that Pecpec committed each of the 19 acts represented in the State's exhibits. The presentation of evidence, jury instructions, and arguments of counsel [20] made clear that there was a one-to-one relationship between the State's exhibits and the charged counts. Accordingly, each juror must have concluded that Pecpec had committed each of the acts represented in the exhibits in order to have found him guilty on 19 counts.

Moreover, the jury was instructed 25 separate times, i.e., once for each count, as to the elements of the offense. The jury also was instructed 25 separate times that it was required to return a verdict of "Not guilty" or "Guilty as charged of Violation of An Order for Protection" on each count. Finally, the jury was instructed 25 separate times, "Your verdict must be unanimous." Thus, it would have been unreasonable for a juror to believe that a single exhibit could have satisfied the State's burden of proof on more than one count.

Counsels' arguments reinforced the one-to-one relationship between acts and counts. In its opening statement, the State asserted that, "between October 19 and November 8th of [2009], [Pecpec] left 25 voice mails and text messages total for the complainant" and that "Pecpec is charged with 25 counts of Violation of an Order for Protection." During closing argument, the State argued:

cific unanimity instruction was not required under this court's caselaw, and opined that, "since the jury returned guilty verdicts as to all of the sexual assault counts, any error caused by individual jurors considering different instances of culpable conduct for each count is probably harmless." *Id.* at 155, 34 P.3d at 1054.

The State is correct that, under the rule in *Keomany*, a specific unanimity instruction would not be required in the instant case. However, *Keomany* preceded our decision in *Mundon*, which held that a specific unanimity instruction was required under circumstances similar to those presented here. 121 Hawai'i at 355, 219 P.3d at 1142. Accordingly, *Keomany* is unpersuasive.

In oral argument, the State also argued that *State v. Horswill*, 75 Haw. 152, 158–59, 857 P.2d

579, 582–83 (1993), stands for the proposition that a unanimity instruction is not required where there are an equal number of acts and counts. However, *Horswill* did not address a defendant's constitutional right to a unanimous verdict, *id.*, and in any event, preceded our decisions in *Arceo* and *Mundon*, which identify the circumstances under which such an instruction is required.

20. Although "arguments of counsel are not evidence[,]" *State v. Yamada*, 108 Hawai'i 474, 480 n. 9, 122 P.3d 254, 260 n. 9 (2005), they are nonetheless relevant to our analysis here. The arguments of counsel were consistent with the presentation of evidence and the jury instructions, which reflected a one-to-one relationship between acts and counts.

*For each violation of an Order for Protection, the State needs to prove four things. . . .*

. . . .

Now, turning to the *third element—and again, these apply to each of the 25 charges*—did he intentionally or knowingly engage in conduct that was prohibited by the Order for Protection?

. . . .

*Well, it wasn't an accident. He left her 17 voice mails.* You heard the voice mails. . . . *He sent her eight text messages.* He acknowledged the text message referring to the GPS. . . .

. . . .

*Now, you have before you 25 counts and numerous dates of incidents.* Let's go over it quickly to try to break it down and make it a little easier.

Okay. *So we're talking about 25 counts of Violation of an Order for Protection.* We know that they fall into two categories—voice mails and text messages. The *voice mails would be your first 17 counts, Counts [1] to [17]. The text messages would be your next eight counts, Counts [18] to [25].*

Now, let's look first at the voice mails. The voice mails are grouped in terms of the dates of incident. Counts [1] through [6] are from October 19, 2009; Count [7] is from October 22; Counts [8] to [15] are November 6; Count [16] from November 7; and Count [17] is from November 8.

Now, you listened to voice mails. These voice mails are also associated with these dates. *Exhibit 23 is the voice mail from October 22; Exhibit[s] 15 to 22 are from November 6; Exhibit 14 is from November 7; Exhibit 13 is from November 8.*

Switching now to the text messages. Counts [18] to [25], they are also grouped in terms of the dates of incident. Counts [18] to [22] are from November 6; Counts [22] to [25] are from November 7. *For each of these text messages there are exhibits.* Exhibits 5 through 9 are the text messages from November 6; and Exhibits 10 to 12 are the text messages from November 7.

Ladies and gentlemen, you heard all the evidence. You've seen the witnesses testify. Defendant Orlando *Pecpec is guilty of*

*25 counts of Violation of an Order for Protection.*

(Emphasis added).

Likewise, defense's closing fairly indicated a one-to-one relationship between the counts and the acts:

Okay. Now, *let's further review the testimony as to each count.*

[CW] admitted to you in court that she knows that the Order for Protection allowed [Pecpec] to have limited contact with her regarding attending courtroom proceedings. You know what? *For Count I, October 19th, 2009, at 10:03, that's exactly what had happened.* [Pecpec]—we know from (indiscernible) also, too, that there was a hearing. We know that [Pecpec] got to court late, at about 9:30. He testified that he then called [CW] to ask about the hearing. The time frame of the—of the call and the circumstances, that he was late, about the—that he—about the time that the call was made, as [CW] says, supports [Pecpec's] testimony. And that's what [Pecpec's] call was about and not as what [CW] would have you to believe. You know that [CW] lacks credibility because of the inconsistent—inconsistencies in her testimony about the lack of reporting on the October 19th, 2009, messages. I've spoken about this just briefly before. But let me go into detail.

*This has to do with Counts [2], [3], and [4].* She testified, as I said before, touched on it lightly. She says that—she testified that the reason she did not make the recordings of *messages supposedly left by [Pecpec] on the morning of the 19th—October 19th, 2009, at 10:14, 10:24, and 10:26* were because she had written down whatever the message said on the statement she gave to police.

(Emphasis added).

And finally, in rebuttal closing, the State again highlighted the one-to-one relationship between the counts and the contacts:

Ladies and gentlemen, *the Order for Protection prohibits him, prohibits [Pecpec] from contacting [CW],* threatening

her. *State has shown beyond a reasonable doubt that he did just that 25 times.* (Emphasis added).

Because the one-to-one relationship between counts and acts was made clear to the jury, and the jury found Pecpec guilty on 19 counts for which 19 exhibits were presented at trial, there is no " 'genuine possibility' that different jurors concluded that [the defendant] committed different acts." [21] *Cf. Mundon*, 121 Hawai'i at 354–55, 219 P.3d at 1141–42 (citation omitted); *State v. Valentine*, 93 Hawai'i 199, 208, 998 P.2d 479, 488 (2000) (holding that no specific unanimity instruction was necessary because "there was no danger that the jury would be confused regarding the conduct of which [the defendant] was accused and that constituted the charged offense"). Accordingly, the family court's error in failing to give a unanimity instruction was harmless beyond a reasonable doubt.

### B. The family court abused its discretion in sentencing Pecpec to a consecutive term on Count 13

▉ Pecpec argues that the family court erred in sentencing him to a consecutive term on Count 13 based on the act represented in Exhibit 17 because the verdict on that count was not unanimous. However, as discussed *supra*, the jury must have unanimously concluded that Pecpec committed the act represented in Exhibit 17 to have found him guilty on all 19 counts. Nevertheless, Pecpec argues that the sentence was improper because, "it was impossible to know which acts of 11/6/08 attached to which counts of the indictment [sic.]" Pecpec contends that "the

trial court should not be connecting exhibit 17 to count 13 'after conferring with counsel for both the prosecution and the defense[.]' " (Quoting *Pecpec*, 2011 WL 2037679, at *5). We agree.

It is axiomatic that a criminal sentence is imposed in relation to a specific offense upon which a defendant has been found guilty. *See* HRS § 706–605 (Supp.2006) ("Authorized disposition of *convicted defendants* ") (emphasis added); HRS § 706–605 cmt. ("This section states the various sentencing alternatives that are available to the court *upon conviction of a defendant for an offense.*") (emphasis added). However, in the instant case, the record does not reflect that the jury specifically correlated Exhibit 17 with Count 13. Accordingly, the family court sentenced Pecpec based on conduct that was not necessarily linked to Count 13 by the jury.

In addition, although the family court asked both counsel which count of the complaint reflected the conduct in Exhibit 17, defense counsel was unable to respond because he "didn't bring [his] complete file." Accordingly, defense counsel did not affirmatively correlate Exhibit 17 with Count 13. Finally, we note that the complaint identified specific police reports as relating to each count. Based on those police reports, it appears that Exhibit 17, which CW testified was received on November 6, 2011 at 1:28 p.m., would correspond to Count 10, rather than Count 13.

In sum, the record does not support an inference that the jury found Pecpec guilty on Count 13 based specifically on the conduct memorialized in Exhibit 17.[22] Accordingly, the family court abused its discretion in sen-

---

21. The dissent, relying on *Arceo*, suggests that it is "speculation" to conclude that the jury unanimously found Pecpec had committed each of the 19 acts offered in support of the 19 counts. Dissenting opinion at 47, 276 P.3d at 616. However, as stated, *Arceo* is distinguishable from the instant case, because it involved "separate and distinct culpable acts [ ] subsumed within a single count," and therefore a "genuine possibility" that the jurors may not have unanimously agreed that the defendant committed the same act. 84 Hawai'i at 32–33, 928 P.2d at 874–75 (citation omitted). In contrast, in the instant case, the State did not present evidence of multiple acts that could support conviction under each count. To the contrary, the 19 counts on which Pecpec was found guilty were supported at trial by 19 exhibits, with each exhibit reflecting a single act. Accordingly, there is no reasonable possibility

that Pecpec was convicted on less than a unanimous verdict.

In addition, the ICA dissent opined that some of the jurors may have relied on one act in order to find Pecpec guilty on more than one count. *Pecpec*, 2011 WL 2037679, at *7. Put another way, the ICA dissent was concerned that some jurors may not have been aware of the one-to-one relationship between the counts and acts. However, because we conclude that the one-to-one relationship would have been clear to a reasonable juror, we do not find a genuine possibility for juror confusion in this respect.

22. We respectfully disagree with the dissent's assertion that we have concluded "that the verdict on Count 13 'was not unanimous.' " Dissenting opinion at 43, 276 P.3d at 612. Our concern with regard to Count 13 is not based on a purported lack of unanimity, and is limited to the

tencing Pecpec to a consecutive term on that basis.[23]

## IV. Conclusion

For the foregoing reasons, we vacate Pecpec's sentence on Count 13 and remand for resentencing. We affirm the family court's judgment of conviction and sentence in all other respects.

Concurring and Dissenting Opinion by ACOBA, J., with whom DUFFY, J., Joins.

In this case, certain multiple acts were submitted in evidence to the jury by Respondent/Plaintiff–Appellee State of Hawai'i (Respondent or prosecution) without any election at or before the close of its case-in-chief as to which act pertained to a particular count. In the absence of such an election, the circuit court of the first circuit (the court) was required to "give[ ] the jury a specific unanimity instruction, i.e., an instruction that advises the jury that all twelve of its members must agree that the *same underlying criminal act* has been proved beyond a reasonable doubt." *State v. Arceo*, 84 Hawai'i 1, 32–33, 928 P.2d 843, 874–75 (1996) (emphasis added). The court failed to do this, leaving the reasonable possibility that " 'conviction [ ] occur[ed] as a result of different jurors concluding that [Petitioner/Defendant–Appellant Orlando Pecpec (Petitioner) ] committed different acts' " with respect to any particular count, or that a single act supported more than one count. *Id.* at 32, 928 P.2d at 874 (quoting *United States v. Echeverry*, 719 F.2d 974, 975 (9th

Cir.1983). Thus, Petitioner's right to secure unanimous agreement by the jurors as to the specific act attributable to a particular count, *see id.* at 32–33, 928 P.2d at 874–75, "guaranteed by article I, sections 5 and 14 of the Hawai'i Constitution[,]" *id.* at 30, 928 P.2d at 872, was violated.[1]

Consequently, I must respectfully dissent. In my view, (1) because Respondent did not elect the specific exhibit that was being offered in support of each count, the court was required to give the jury a specific unanimity instruction, (2) the court's failure to give the jury a specific unanimity instruction violated Petitioner's right to secure a unanimous verdict, (3) such error was not harmless beyond a reasonable doubt, and (4) in order to avoid unnecessary appeals in this type of case in the future, the circuit "courts in every [such] case [should be mandated] to instruct the jury that all of its members must unanimously agree to 'the same underlying ... act' or acts that constitute the conduct they find culpable under the charge, before they may find a defendant guilty[,]" without regard to the prosecution's election. *State v. Kealoha*, 95 Hawai'i 365, 378, 22 P.3d 1012, 1025 (App. 2000) (ellipsis in original).[2]

### I.

### A.

Respondent charged Petitioner by complaint with twenty-five counts of Violation of an Order for Protection (Protection Order), HRS § 586–11(a)(1)(A) (Supp.2010).[3] The

---

court's sentence, rather than the jury's verdict. As stated, we vacate the consecutive term sentence on Count 13 because the record does not reflect that the jury specifically correlated Exhibit 17 to Count 13. We note that a unanimity instruction would not cure this defect, as it nonetheless would not be apparent which exhibit the jury relied on in convicting on Count 13.

**23.** Based on our resolution of this issue, we do not address Pecpec's argument that the consecutive term sentence violated his rights to due process, equal protection, and against cruel and unusual punishment under the United States and Hawai'i constitutions.

**1.** Article I, section 5 the Hawai'i Constitution provides that "[n]o person shall be deprived of life, liberty or property without due process of law, nor be denied the equal protection of the laws, nor be denied the enjoyment of the person's civil rights or be discriminated against in

the exercise thereof because of race, religion, sex or ancestry." Article I, section 14 provides in relevant part that, "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial by an impartial jury."

**2.** As discussed *infra*, I concur as to the majority's conclusion that Petitioner's conviction on Count 13 was not unanimous and thus did not support Petitioner's consecutive sentence on that count.

**3.** HRS § 586–11(a)(1)(A) provides:

(a) Whenever an order for protection is granted pursuant to this chapter, a respondent or person to be restrained who knowingly or intentionally violates the order for protection is guilty of a misdemeanor. A person convicted under this section shall undergo domestic violence intervention at any available domestic violence program as ordered by the court.

language of all twenty-five counts was identical except for the dates of the alleged violation. The counts alleged violations of the Protection Order occurring on the following dates:

| | |
|---|---|
| Counts 1–6: | October 19, 2009 |
| Count 7: | October 22, 2009 |
| Counts 8–15: | November 6, 2009 |
| Count 16: | November 7, 2009 |
| Counts 17: | November 8, 2009 |
| Counts 18–22: | November 6, 2009 |
| Counts 23–25: | November 7, 2009. |

At trial, Respondent introduced nineteen separate exhibits in support of Counts 7–25. The exhibits consisted of eight copies of text messages, five messages dated November 6, 2009 and three dated November 7, 2009. Respondent also introduced a total of eleven compact disks of voice mail messages, one dated October 22, 2009, eight dated November 6, 2009, one dated November 7, 2009, and one dated November 9, 2009.[4]

At no point prior to or during trial did Respondent specify the act, as represented by an exhibit, upon which it was relying to prove each count. During closing argument, with the exception of Counts 7, 16, and 17, Respondent attempted to tie *groups* of counts with *groups* of exhibits:

> Okay. So we're talking about 25 counts of Violation of an Order for Protection. We know that they fall into two categories—voice mails and text messages. The voice mails would be your first 17 counts, Counts 1 to 17. The text messages would be your next eight counts, Counts 18 to 25.
>
> Now, let's look first at the voice mails. The voice mails are grouped in terms of the dates of incident. Counts 1 through 6 are from October 19, 2009; Count 7 is from October 22; Counts 8 to 15 are November 6; Count 16 from November 7; and Count 17 is from November 8.
>
> Now, you listened to the voice mails. These voice mails are also associated with these dates. Exhibit 23 is the voice mail from October 22; Exhibit[s] 15 to 22 are from November 6; Exhibit 14 is from November 7; Exhibit 13 is from November 8.
>
> Switching now to the text messages. Counts 18 to 25, they are also grouped in terms of the dates of incident. Counts 18 to 22 are from November 6; Counts 23 to 25 are from November 7. For each of these text messages there are exhibits. Exhibits 5 through 9 are the text messages from November 6; and Exhibits 10 to 12 are the text messages from November 7.

However, Respondent never linked a specific exhibit to a specific count.

No exhibits were offered in support of Counts 1–6 pertaining to October 19, 2009 and the jury acquitted Petitioner on those counts. The jury found Petitioner guilty on Counts 7–25. There was only one exhibit for each of the dates set forth in Counts 7, 16, and 17. Accordingly, it would have been obvious to the jury which exhibit was being offered in support of those Counts and Petitioner does not appeal those convictions. Petitioner argues that the jury verdict was not unanimous as to the remaining counts.

## II.

This case is governed by the well-established principles announced in *Arceo*. In *Arceo*, the defendant was charged with one count of sexual assault in the third degree (sexual contact) and one count of sexual assault in the second degree (sexual penetration). The prosecution offered evidence of multiple acts of sexual contact and multiple acts of sexual penetration to support each count. *See id.* at 5–10, 928 P.2d at 847–52. This court held that when separate and distinct culpable acts are subsumed within a single count—any one of which could support a conviction thereunder—the defendant's

---

4. The exhibits introduced were as follows:

| | |
|---|---|
| Exhibit 5: | 11/06/09 text message |
| Exhibit 6: | 11/06/09 text message |
| Exhibit 7: | 11/06/09 text message |
| Exhibit 8: | 11/06/09 text message |
| Exhibit 9: | 11/06/09 text message |
| Exhibit 10: | 11/07/09 text message |
| Exhibit 11: | 11/07/09 text message |
| Exhibit 12: | 11/07/09 text message |
| Exhibit 13: | 11/08/09 voice mail |
| Exhibit 14: | 11/07/09 voice mail |
| Exhibit 15: | 11/06/09 voice mail |
| Exhibit 16: | 11/06/09 voice mail |
| Exhibit 17: | 11/06/09 voice mail |
| Exhibit 18: | 11/06/09 voice mail |
| Exhibit 19: | 11/06/09 voice mail |
| Exhibit 20: | 11/06/09 voice mail |
| Exhibit 21: | 11/06/09 voice mail |
| Exhibit 22: | 11/06/09 voice mail |
| Exhibit 23: | 10/22/09 voice mail |

constitutional right to a unanimous verdict is violated unless, to reiterate, "at or before the close of its case-in-chief, the prosecution . . . elect[s] the *specific act* upon which it is relying to establish the 'conduct' element of the charged offense[,]" or "the trial court gives the jury a specific unanimity instruction, i.e., an instruction that advises the jury that all twelve of its members must agree that the same underlying criminal act has been proved beyond a reasonable doubt." *Arceo,* 84 Hawai'i at 32–33, 928 P.2d at 874–75 (emphasis added).

While the facts of the instant case differ slightly from *Arceo,* insofar as in *Arceo* there was evidence of more acts than there were counts and here there was an equal number of exhibits and counts, *Arceo* precepts nevertheless apply. What controls here, as in *Arceo,* is the principle that a defendant is entitled to have the jury unanimously agree that the same underlying criminal act supported conviction on a particular count. Petitioner's constitutional right to a unanimous verdict was not guaranteed here because the prosecution failed to elect the particular exhibit representing a specific act that was being offered in support of each count and, in light of that failure, the court should have given the jury a specific unanimity instruction but did not do so. *Arceo,* 84 Hawai'i at 32–33, 928 P.2d at 874–75.

*State v. Mundon* confirms that a specific unanimity instruction was required. In *Mundon,* the prosecution offered two separate acts in support of two counts of terroristic threatening in the first degree (TT1), and the jury found the defendant (Mundon) guilty on only one count. *See* 121 Hawai'i 339, 353, 219 P.3d 1126, 1140 (2009). The *Mundon* court noted that "[a]t first blush, it would seem that, under *Arceo,* a unanimity instruction would not be required inasmuch as Mundon was charged with two counts of TT1 based on two separate and distinct culpable acts" whereas in *Arceo,* the prosecution offered two separate acts, but argued that they supported only one offense. *Id.*

But, according to *Mundon, Arceo* "referred to a line of federal decisions that recognized that the jury should be given a specific unanimity instruction under additional circumstances." *Id.* For example, *Echeverry,* 719 F.2d at 974–75, held that where

" 'there is *a genuine possibility of jury confusion or that a conviction may occur as the result of different jurors concluding that the defendant committed different acts, the general unanimity instruction does not suffice*'" and "[t]o correct any potential confusion in such a case, the trial judge must augment the general instruction *to ensure the jury understands its duty to unanimously agree to a particular set of facts*[.]" (Emphases added.)

The *Mundon* court concluded that there was a possibility of jury confusion since the jury "(1) was not given a specific unanimity instruction with respect to the offense of TT1; (2) *was never informed which act committed by Mundon coincided with Counts 4 and 26, respectively;* and (3) convicted Mundon of one count of TT1 and acquitted him of the other[.]" *Id.* (emphasis in original). *Mundon* thus held that "to 'correct any potential confusion' in [that] case, a specific unanimity instruction should have been given[.]'" *Id.* (quoting *Echeverry,* 719 F.2d at 975).

### III.

In the instant case, as to Counts 7–25, various alleged acts were offered by Respondent to support each count, with the exception of Counts 7, 16, and 17, as previously noted. For example, there were a total of thirteen counts alleging violations occurring on October 6, 2009 and a total of thirteen exhibits dated October 6, 2009. The ICA concurring and dissenting opinion (hereinafter, "ICA dissent") pointed out that Respondent did not specify which exhibit related to which count:

At trial, [Respondent/Plaintiff–Appellee State of Hawai'i (Respondent) ] *introduced exhibits in support of nineteen of the counts (Counts 7–25)* [ ] . . . . The exhibits consisted of:

[ ] eleven compact disks[ ] . . . of voice mail messages left by [Petitioner/Defendant–Appellant Orlando V. Pecpec (Petitioner) ] on the work telephone of the Complaining Witness ("CW") on October 22 (1 message), *November 6 (8 messages),* November 7 (1 message) and November 8, 2009 (1 message) . . .

[ ] copies of eight text messages, identified by date, sent by [Respondent] to CW's cellular telephone on *November 6 (5 messages)* and *November 7, 2009 (3 messages)*.

Although each count in the complaint indicates the date on which an alleged violation occurred, *the time at which it occurred was not included, and [Respondent] did not explain which messages related to which counts.*

In closing argument, [Respondent] tied Counts 7–25 to the evidence of nineteen incidents that supported those counts. For all counts except Count 7 (Exhibit 23), Count 16 (Exhibit 14) and Count 17 (Exhibit 13) [ ] *the correlation was non-specific (to a group of exhibits) rather than specific (to a single exhibit)* [.]

*State v. Pecpec,* No. 30500, 125 Hawai'i 240, 2011 WL 2037679, at *6 (App. May 25, 2011) (Reifurth, J., concurring and dissenting) (emphases added).

At no point then did Respondent identify the "specific act upon which it was relying to establish the 'conduct' element of" each count. *Arceo,* 84 Hawai'i at 32–33, 928 P.2d at 874–75. Although Respondent attempted during closing argument to associate groups of counts with groups of alleged acts, even then, Respondent never linked any specific act with a particular count.

Moreover, as discussed *infra,* even if Respondent had identified the act upon which it was relying to support each count, Respondent had to make this election *before* its closing argument in its case-in-chief. *See Arceo,* 84 Hawai'i at 32–33, 928 P.2d at 874–75 (holding that a unanimity instruction is required unless the prosecution elects "the specific act upon which it is relying to establish the 'conduct' element of the charged offense" "*at or before the close of its case-in-chief*"); *see also State v. Kassebeer,* 118 Hawai'i 493, 509, 193 P.3d 409, 425 (2008).

In *Kassebeer,* the prosecution elicited during its case-in-chief testimony regarding facts that could serve as a basis for two instances of kidnapping to support a single kidnaping charge. 118 Hawai'i at 509, 193 P.3d at 425. The prosecution contended that by referencing only one instance during its closing argument, "a de facto election of the specific act was effected." *Id.* at 508, 193 P.3d at 424. This court rejected that argument because "the prosecution's election of the specific act must take place '*at or before the close of its case-in-chief*[.]' " *Id.* at 509, 193 P.3d at 425 (quoting *Arceo,* 84 Hawai'i at 33, 928 P.2d at 875) (emphasis in original). Thus, according to *Kassebeer,* the prosecution's attempted election during closing argument was invalid. *Id.* In light of *Kassebeer,* Respondent could not have made a valid election during its closing argument.

The reason for this would seem obvious. Initially, it would be unfair to allow the prosecution to elect the specific act upon which it is relying at a time when the defendant is unable to respond by challenging the selected act or by presenting counter-evidence as to that act. Moreover, the prosecution must elect at or before its case-in-chief because " 'arguments of counsel are not evidence' " that the jury must consider in deliberating over a defendant's guilt or innocence. *State v. Quitog,* 85 Hawai'i 128, 144, 938 P.2d 559, 575 (1997) (quoting *State v. Marsh,* 68 Haw. 659, 661, 728 P.2d 1301, 1303 (1986)). " 'Arguments by counsel are likely to be viewed as statements of advocacy," as opposed to "a definitive and binding statement of law." *Kassebeer,* 118 Hawai'i at 510, 193 P.3d at 426 (quoting *State v. Nichols,* 111 Hawai'i 327, 340 n. 8, 141 P.3d 974, 987 n. 8 (2006)). In sum, the prosecution's election during closing argument would not " 'ensure that the jury understands its duty to unanimously agree to a particular set of facts.' " *Arceo,* 84 Hawai'i at 32, 928 P.2d at 874 (quoting *Echeverry,* 719 F.2d at 975).

IV.

First, because there was a possibility " 'that a conviction may occur as a result of different jurors concluding that [Petitioner] committed different acts,' " and Respondent failed to specify which act supported each count, a specific unanimity instruction was required. *Arceo,* 84 Hawai'i at 32, 928 P.2d at 874 (quoting *Echeverry,* 719 F.2d at 975. Without such an instruction, there is no way to assure that the jury understood its duty to unanimously agree that the same exhibit supported a particular count.

Additionally, as stated by the ICA dissent nothing prevented any individual juror, unin-

structed as to his or her duty, from concluding that a single exhibit was sufficient to support a conviction on more than one count with the same date:

> [N]othinq prevent[ed] individual jurors from concluding that different conduct support[ed] conviction on any particular count. For example, Juror 1 might [have] conclude[d] that Exhibit 15 (voice mail received November 6, 2009 at 1:00 p.m.) support[ed] conviction on Count 8 and that Exhibit 16 (voice mail received November 6, 2009 at 1:25 p.m.) support[ed] conviction on Count 9, while Juror 2[did] not believe that Exhibit 15 support[ed] a conviction at all, but that Exhibit 16 support[ed] a conviction on both Counts 8 and 9.

*Pecpec,* 2011 WL 2037679, at *7 (Reifurth, J., concurring and dissenting) (emphasis added).

Several counts alleged violations of the Protection Order occurring on the same date and various exhibits (some text messages and some voice mail messages) with the same date were presented to the jury without any other identifying information.[5] It is entirely conceivable, then, that different jurors could have tied different acts to different counts, or that some jurors could have tied a single act to more than one count containing the same date. Therefore, there is a reasonable possibility the jury did not agree unanimously on the same act as supporting a particular count for which Petitioner was convicted.

Because "there may not have been a unanimous verdict as to [Petitioner]'s conviction for [each act,]" *Mundon,* 121 Hawai'i at 355, 219 P.3d at 1142, the court's error in not giving a specific unanimity instruction contributed to Petitioner's conviction on the several counts. A defendant's right to a unanimous verdict is so fundamental that the court's error in failing to secure it cannot be said to be harmless beyond a reasonable doubt. *See Arceo,* 84 Hawai'i at 33, 928 P.2d at 875 (concluding that because the defendant's "substantial constitutional right to unanimous jury verdicts was prejudiced" and it could not be said "that there was no reasonable possibility that the circuit court's

error contributed to [the defendant]'s convictions, . . . the error was not harmless beyond a reasonable doubt").

## V.

The same problem infected the court's sentence of a consecutive term on Count 13. Respondent urged the court to sentence Petitioner to one year of imprisonment on each count to run concurrently, except for four counts to run consecutively. The court asked Respondent for which four counts Respondent was seeking a consecutive sentence. Respondent conceded that it had not "identified any particular four" and the reason it was seeking four consecutive sentences was because Respondent believed "five years [imprisonment] total [was appropriate] in light of the number of violations, the nature of the violations, the impact that it's had on [CW], as well as the fact that there's been an extended history."

Before sentencing Petitioner, the court attempted to determine the particular count with which Exhibit 17 coincided:

> THE COURT: Okay. [Respondent], Exhibit 17, November 6, 2009, turning your attention to the transcripts, is that Count [10]?"
>
> [RESPONDENT]: Exhibit 17 is Count [13].
>
> THE COURT: Exhibit 17 is—is Count [13]?
>
> [RESPONDENT]: Yes, your honor.

According to the majority, the complaint identified specific police reports relating to each count, and based on those police reports Exhibit 17 was in fact tied to "Count 10 rather than Count 13." Majority opinion at 37, 276 P.3d at 606. These police reports, however, were not admitted into evidence or given to the jury. Respondent itself, then, was apparently confused as to the particular count that was related to Exhibit 17 telling the court that Exhibit 17 was related to Count 13 rather than Count 10. The court nevertheless accepted Respondent's mistaken view, restating that Count 13, "I believe is [related to] Exhibit 17."[6]

---

**5.** It is noted that although CW testified as to the times each text message was received, none of the counts alleged a specific time. Also, Petitioner submitted evidence that contradicted the exis-

tence of certain messages and the times of the messages claimed by CW.

**6.** The court said that in Exhibit 17, a November 6, 2009 voice mail message, Petitioner "blames

Emblematic of the seeming confusion generated at trial, even Respondent, under its own view of the case, erred in connecting Exhibit 17 to the wrong count. The court apparently went along with Respondent's incorrect response and had to have assumed that the jury also related Exhibit 17 to Count 13 in order to impose a consecutive sentence. Of course Respondent was in error and the court based its consecutive sentence on that error. Relatedly there is no ground for believing that the jury would ascertain without instruction that Exhibit 17 was connected with Count 10 when Respondent itself could not make that connection and the court in adopting the Respondent's error, did not do so.

More significantly, as discussed, Counts 8–15 and Counts 18–22 all allege a violation of the Protection Order on the same date, November 6, 2009. Exhibits 5–9 are text messages allegedly sent on November 6, 2009, and exhibits 15–22 are voice messages allegedly left on November 6, 2009. It is impossible to ascertain which of the November 6, 2009 exhibits each juror concluded supported Petitioner's conviction on Count 13. There is no assurance, then, that the conviction as to Count 13 was unanimous as to a specific act. In the absence of assurance that there was unanimous agreement on one act as to Count 13, the court's imposition of a consecutive sentence on that count cannot be sustained.

### VI.

The majority likewise deduces that the court erred in not providing the jury with a specific unanimity instruction and that the verdict on Count 13 "was not unanimous." Majority opinion at 35, 38, 276 P.3d at 604, 607. Nevertheless, the majority concludes the court's failure to give a specific unanimity instruction was harmless. Respectfully, the majority's positions cannot be reconciled with

one another. The majority's conclusion that the court's error in failing to give a specific unanimity instruction was harmless is entirely inconsistent with its conclusion that Petitioner's conviction as to Count 13 "was not unanimous." Majority opinion at 37, 276 P.3d at 606.

As the majority appears to acknowledge, the verdict as to Count 13 was not unanimous because it cannot be assured that the jury agreed unanimously that the same act supported that count. *See Arceo,* 84 Hawai'i at 33, 928 P.2d at 875 (where the prosecution fails to elect the specific act upon which it is relying, the circuit court must "advise[ ] the jury that all twelve of its members must agree that the *same underlying criminal act* has been proved beyond a reasonable doubt") (emphasis added). Like Count 13, it cannot be assured that, as to all the *other* counts appealed, that the jurors agreed unanimously on the same act as to a particular count. If there cannot be assurance that the verdict was unanimous as to the alleged act on Count 13, the verdict cannot be assured to be unanimous as to a specific act with respect to each of the other counts. On the same rationale, if the verdict as to Count 13 is invalid, the verdict must be invalid as to the other counts. Hence, the conviction on the other remaining counts, like Count 13, must also be vacated.[7]

### VII.

According to the majority, however, there is no reasonable possibility the jurors did not unanimously agree that Petitioner committed each alleged act because (1) "the presentation of evidence, (2) jury instructions, and (3) arguments of counsel made it clear that there was a one-to-one relationship between [the] exhibits and the charged counts." *Id.* at 35, 276 P.3d at 604.

---

[CW] for sending him to jail[,]" states that "because he went to jail because of her it made him stronger[,]" and that "there's a price to pay for all of these things." The court interpreted this "in its context to be a threat to the victim's life. The court takes this serious [sic]."

**7.** As the majority acknowledges, it "would not be apparent which exhibit the jury relied on in convicting on Count 13." Majority opinion at 38 n. 23, 276 P.3d at 607 n. 23. But, had Respon-

dent identified which exhibit pertained to which count, it would be apparent on which exhibit the jury relied. Because the prosecution did not make that necessary identification, "a specific unanimity instruction would [have indeed] cure[d] this defect." *Id.* Thus, respectfully, it is the absence of assurance that the jury unanimously agreed as to a specific exhibit that invalidates the consecutive sentence on Count 13, as it must every other sentence on the remaining counts appealed.

## A.

Preliminarily, as the majority must acknowledge, *see* majority opinion at 35, 276 P.3d at 604, "[e]rroneous instructions are presumptively harmful and are a ground for reversal *unless it affirmatively appears from the record as a whole that the error was not prejudicial.*" *State v. Nichols,* 111 Hawai'i 327, 334, 141 P.3d 974, 981 (2006) (emphasis added). The majority's assertion that a one-to-one relationship between the counts and exhibits was clear to the jury cannot be discerned from the record. Correlatively, nothing affirmatively appears from the record to rebut prejudice from giving only the general unanimity instruction.

## B.

### 1.

As to the presentation of evidence, the fact that there were an equal number of counts as there were exhibits would not *ipso facto* suggest a one-to-one relationship between the counts and exhibits to the jury. Indeed, *Mundon* is to the contrary.

As recounted, in *Mundon,* the prosecution adduced evidence of an equal number of alleged acts and counts. 121 Hawai'i at 354, 219 P.3d at 1141. This court did not conclude that the jury would have understood that there was a one-to-one relationship between the counts and alleged acts. Nor did this court presume in light of the equal of number of counts to acts that the jury would understand that it was to unanimously agree that the same act supported Mundon's conviction on the single count for which Mundon was convicted. Rather, this court determined that there was a possibility the jury would have been confused as to this duty because the prosecution did not specify which act coincided with each count and the court did not give the jury a specific unanimity

instruction. *Id.*[8] The majority's assertion that the one-to-one relationship between the counts and acts was clear to the jury cannot be reconciled with *Mundon.*

### 2.

As to the jury instructions, the majority notes that the jury was instructed 25 separate times (a) as to the elements of the offense, (b) that it was required to return a verdict of "guilty" or "not guilty," and (c) that its verdict must be unanimous. *Id.* at 37, 276 P.3d at 606. With respect to the elements of the offense, the court repeated identical instructions (except for the number of the count and date) seventeen times for Counts 1–17, as follows:

> As to Count [x] of the Complaint, [Petitioner] is charged with the offense of Violation of An Order for Protection.
>
> A person commits the offense of Violation of An Order for Protection if he intentionally or knowingly engages in conduct which is prohibited by an Order for Protection issued by a Judge of the Family Court that was then in effect. There are four material elements of the Offense of Violation of An Order for Protection, each of which the prosecution must prove beyond a reasonable doubt.
>
> These four elements are:
>
> 1. That on or about [x date], in the City and County of Honolulu, State of Hawai'i, an Order for Protection issue by a Judge of the Family Court pursuant to Chapter 586 of the [HRS], was in effect, prohibiting [Petitioner] *from engaging in certain conduct, namely contacting or threatening [CW], by either telephone or recorded message;* and
>
> 2. That on or about [x date], in the City and County of Honolulu, State of

---

8. The majority states that in *Mundon,* this court held that there was a possibility for jury confusion because (1) no unanimity instruction was given, (2) the prosecution failed to elect the particular supporting each count, and (3) the jury convicted Mundon on one count and acquitted him on the other, emphasizing the third item. Majority opinion at 34 n. 19, 276 P.3d at 603–04 n. 19 (citing 121 Hawai'i at 355, 219 P.3d at 1141–42). However, as the majority must acknowledge, the necessity for a specific unanimity instruction cannot hinge on the third ground

inasmuch as the jury must be instructed *before* it deliberates. *See* majority opinion at 35, 276 P.3d at 604. Rather, the confusion coupled with the acquittal manifested the confusion that occurred because no specific unanimity instruction was given. Hence, *Mundon* must be read as requiring a specific unanimity instruction where there is an equal number of counts and acts and the prosecution fails to elect the act supporting each count, in order to avoid the situation where it is uncertain as to which act the jury convicted and on which it acquitted.

Hawai'i, [Petitioner] intentionally or knowingly engaged in *certain conduct, namely contacting or threatening [CW], by either telephone or recorded message,* which was conduct prohibited by the Order [for] Protection; and

3. That [Petitioner] knew, at the time, that such conduct was prohibited by the Order for Protection; and

4. That [Petitioner] was given notice of the Order for Protection prior to engaging in such conduct by having been personally served with the Order for Protection.

The prosecution must prove beyond a reasonable doubt that [Petitioner] acted intentionally or knowingly as to each element of the offense.

(Emphases added.) Then, as to Counts 18–25, the court repeated the same instruction, but replaced the phrase "by either telephone or recorded message" with the phrase "by text message."

Assuming the foregoing instructions at least alerted the jury that Counts 1–17 were voice mail messages and Counts 18–25 were text messages, none of these matters would indicate to the jurors that each count was to be supported by only one of the multiple alleged acts. The instructions would neither inform the jury that each count must be supported by only one of the alleged acts nor that it had to agree unanimously that that same one act supported a particular count.

Similarly, because there were 25 counts, the court instructed the jury 25 times on the verdict options as follows:

In Count [x] of the Complaint, as to [Petitioner], you may bring in either one of the following verdicts:

1. Not guilty; or
2. Guilty as charged of Violation of An Order for Protection.

Your verdict must be unanimous.

Again, the fact that the foregoing instruction was given 25 separate times would not inform the jury that each count had to be supported by only one of the exhibits. The instruction told the jury that it had to be unanimous as to whether Petitioner was guilty or not as to each count, but it did not apprise the jury that it was required to agree unanimously that the same exhibit supported a particular count. The foregoing instruction

is the general unanimity instruction; however, a *specific* unanimity instruction was required. *Mundon,* 121 Hawai'i at 353, 219 P.3d at 1140.

It should be noted that the foregoing instructions are no different from the standard instructions given in every criminal case. Presumably, they would be the same instructions that were given in *Arceo, Mundon,* and the other cases in which this court subsequently concluded that the jury may have been confused as to its duty to agree that the same act supported the defendant's conviction as to a specific count. Consequently, it cannot be concluded, as the majority does, that the jury would have known based simply on the foregoing general instructions that it was required to agree unanimously that the same single act had been proven beyond a reasonable doubt in support of a particular count. That majority's position would be contrary to *Arceo* and *Mundon.*

3.

Finally, as to the arguments of counsel, the majority emphasizes that, in its opening remarks, Respondent said that Petitioner had left a total of 25 voice mails and text messages and was charged with 25 counts of violating a Protection Order, that Respondent attempted to separate the counts into categories during closing argument, and, that during rebuttal, Respondent reiterated that Petitioner had violated the Protection Order " '25 times.' " *Id.* at 37, 276 P.3d at 606–07. As has already been discussed, the overriding response to this argument is that the prosecution's election cannot be made in final argument. That aside, it bears reiterating that at no time did Respondent elect the specific act coinciding with a particular count. Additionally, the majority's position assumes that the jury *ipso facto* accepted Respondent's argument, when such an assumption is contrary to our law that counsels' arguments are not evidence. *Quitog,* 85 Hawai'i at 144, 938 P.2d at 575. General Instruction No. 3, as given by agreement in this case, in fact instructed the jury that *"[s]tatements or arguments made by lawyers are not evidence. You should consider their arguments to you, but you are not bound by their memory or*

*interpretation of the evidence."* (Emphases added.)

The majority concedes that Respondent's arguments do not constitute evidence but maintains that Respondent's arguments reflected a one-to-one relationship between the alleged acts and counts. Majority opinion at 35 n. 20, 276 P.3d at 604 n. 20. To the contrary, applying General Instruction No. 3, the jury presumably would correctly view Respondent's statements during its closing arguments as " 'statements of advocacy,' " not as " 'binding statement[s] of law.' " *Kassebeer*, 118 Hawai'i at 510, 193 P.3d at 426 (quoting *Nichols*, 111 Hawai'i 327, 340 n. 8, 141 P.3d 974, 987 n. 8). Those statements plainly did not carry the imprimatur of the court, which is duty-bound to instruct on propositions of law for the jury to follow. *See Nichols*, 111 Hawai'i at 335, 141 P.3d at 982 (stating that "it is ultimately the trial court that is responsible for ensuring that the jury is properly instructed").

This court has declared that " '[a]rguments by counsel cannot substitute for an instruction by the court.' " *Kassebeer*, 118 Hawai'i at 509, 510, 193 P.3d at 425, 426 (quoting *Nichols*, 111 Hawai'i at 340 n. 8, 141 P.3d at 987 n. 8). No argument by Respondent could "take the place of a specific unanimity instruction" that the court was required to give in this case. *Id.* Thus in this case, the arguments of counsel are not relevant to the analysis of whether the court's error was harmless. *See* majority opinion at 35 n. 20, 276 P.3d at 604 n. 20.

Respectfully, the majority's suggestion that the jury would have known that each count was to be supported by only one act is wrong. We do not rely on jurors to glean for themselves the law they must apply in a case; to reiterate, it is the duty of the circuit court to properly instruct the jury as to the law the jury must apply. *Nichols*, 111 Hawai'i at 335, 141 P.3d at 982; *See State v. Henderson*, 208 N.J. 208, 27 A.3d 872, 924 (2011) ("[W]e do not rely on jurors to divine rules themselves or glean them from cross-examination or summation" because "it is the court's obligation to help jurors evaluate evidence critically and objectively to ensure a fair trial").

### C.

The majority concludes that where it reasonable to assume that the jury may have *inferred* that there was a one-to-one relationship between the counts and acts, the failure to give the jury a specific unanimity instruction is harmless if the jury convicts on all counts. *See* majority opinion at 36, 276 P.3d at 605. According to the majority, conviction on all counts means the jury unanimously agreed that "each of the acts represented in the exhibits" had been proven beyond a reasonable doubt. *Id.* at 37, 276 P.3d at 606. Respectfully, the majority's position is flawed for several reasons.

First, in the absence of a specific unanimity instruction, the acceptance of a one-to-one relationship was not required of the jury. *Id.* at 36–37, 276 P.3d at 605–06. Thus, it would not be unreasonable for jurors to decide that different acts could be assigned to different counts or for a juror to believe that a single exhibit could satisfy more than one count. *See id.* at 37, 276 P.3d at 606. In the latter instance, conviction on all counts would *not* mean that the jury had *unanimously* agreed that "each of the acts represented in the exhibits" had been proven beyond a reasonable doubt. *Id.* If the majority were correct, *Mundon* would have held, that either election by the prosecution or a specific unanimity instruction is not required where there is an equal number of counts and acts.

If the jury had been told that each count could be supported by only one act and that the jury must agree unanimously that the same act supported a particular count, this court would presume the jury followed the law embodied by the instruction. *State v. Klinge*, 92 Hawai'i 577, 592, 994 P.2d 509, 524 (2000) ('As a rule, juries are presumed to . . . follow all of the trial court's instructions.' " (quoting *State v. Knight*, 80 Hawai'i 318, 327, 909 P.2d 1133, 1142 (1996)). But where, as in this case, the jury was never instructed as to the law in that regard, it would be unreasonable to presume that the jury somehow divined or followed the *Arceo* rule in the absence of being told about it. To conclude otherwise, as the majority does, is to engage in prohibited speculation. *See Arceo*, 84 Hawai'i at 32, 928 P.2d at 874.[9]

---

**9.** As stated, *Arceo* declared that this court may

not speculate about how jurors deliberated over

Thus, "it is ultimately the trial court that is responsible for ensuring that the jury is properly instructed[,]" *Nichols*, 111 Hawai'i at 335, 141 P.3d at 982, it is not for the jury to ascertain by inference what the law requires. As a result of the failure to instruct on this proposition at all, the reasonable possibility cannot be eliminated that, different jurors tied different alleged acts to different counts or that a juror convicted Petitioner on multiple counts having the same date based on one or more but not all alleged acts.

The majority suggests that it does not matter whether each juror tied the same act to the same count because so long as the jury convicted on all counts, the jury unanimously agreed that all acts had been proven beyond a reasonable doubt. But, *Arceo* mandates just that—that where the prosecution fails to elect the specific act supporting a particular count, the court is required to instruct that the jurors must unanimously "agree that the *same underlying criminal act* has been proved beyond a reasonable doubt." *Arceo*, 84 Hawai'i at 33, 928 P.2d at 875 (emphasis added). Also, as noted before, conviction on all counts does not mean the same *acts* were unanimously agreed to by the jurors or that the same acts were not tied to more than one count.

Preliminarily, as the majority concedes, *State v. Keomany*, 97 Hawai'i 140, 34 P.3d 1039 (App.2000), an ICA decision, was decided before this court's decision in *Mundon*, which implicitly overruled *Keomany*. *Keomany* thus provides no authoritative value in light of *Mundon*. It may be noted that in *Keomany*, the concurrence took a position similar to that taken by the majority, noting that " 'any error cause by individuals jurors considering different instances of culpable

conduct for each count is *probably harmless.*' " *Id.* (quoting *Keomany* 97 Hawai'i at 155, 34 P.3d at 1054 (Watanabe, J., concurring) (emphasis added).

Respectfully, the foregoing position is plainly incorrect. Error is either harmless beyond a reasonable doubt or it is not, and the question is not whether there was a "probability" that error contributed to the defendant's conviction but whether there is a reasonable *possibility* error *might have* contributed to the conviction. *Mundon*, 121 Hawai'i 339, 368, 219 P.3d 1126, 1155 (2009) ("In applying the harmless beyond a reasonable doubt standard[,] the court is required to examine the record and determine whether there is a reasonable possibility that the error complained of might have contributed to the conviction.") (Brackets in original.) The concurrence also did not consider that any juror may have erroneously believed one act could support multiple counts. In any event, *Mundon* plainly controls, not *Keomany*.

The majority suggests that the potential for jury confusion in *Mundon* was evidenced in large part by the acquittal on one count, and because there the jury convicted on all counts, here, the error harmless beyond a reasonable doubt. *See* majority opinion at 36, 276 P.3d at 605. But, the *Mundon* court specifically emphasized that the potential for jury confusion exited because the jury "*was never informed which act committed by Mundon coincided with [which of the two] counts[;]* " not on the fact that the jury acquitted Mundon on one count. *Id.* at 354, 219 P.3d at 1141 (emphasis in original). Thus, even if the jury convicts on all counts, absent a specific unanimity instruction there can be no reasonable assurance that there

a defendant's guilt or innocence. 84 Hawai'i at 32, 928 P.2d at 874. The majority suggests that such reliance on *Arceo* is misplaced because *Arceo* is factually distinguishable in that multiple acts were offered in support of one count. Majority opinion at 37, 276 P.3d at 606. However, this distinction was expressly noted in *Mundon* and rejected. This court acknowledged that "[a]t first blush, it would seem that, under *Arceo*, a unanimity instruction would not be required inasmuch as Mundon was charged with two counts of TT1 based on two separate and distinct culpable acts[.]" 121 Hawai'i at 353, 219 P.3d at 1140. Nevertheless, *Mundon* held that a specific unanimity instruction was required where the

number of acts were equal to the number of counts as in this case. *Id.* at 354–55, 219 P.3d at 1141–42. Therefore, contrary to the majority's assertion, the principles of *Arceo* apply to this case pursuant to *Mundon*.

In addition, the majority suggests that speculation regarding how the jury deliberated is not required to reach its conclusion. However, respectfully, the majority's assertion that the jury may have applied a one-to-one relationship between the acts and counts can only be a guess because Respondent did not identify a specific act supporting each count and no specific unanimity instruction was given.

was unanimous agreement as to the same one act on each of the counts. *Mundon* mandates either an election or specific unanimity instruction even where there are an equal number of acts and counts, as in this case.

Moreover, error " 'constitut[ing] an infraction of a substantial constitutional right of the accused ... will rarely be considered harmless error.' " *State v. Napeahi*, 57 Haw. 365, 373, 556 P.2d 569, 574 (1976) (quoting *Chapman v. California*, 386 U.S. 18, 23, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967)). Before "constitutional error will in fact be held harmless, 'the court must be able to declare a belief that it was harmless beyond a reasonable doubt[.]' " *Id.* (quoting *Chapman*, 386 U.S. at 23, 87 S.Ct. 824). "[I]f there is a reasonable possibility that the matter complained of might have contributed to the conviction, the error must give rise to a reversal." *Id.* (internal quotation marks and citation omitted). In light of the foregoing, there is a reasonable possibility that the court's failure to give the jury a specific unanimity instruction in this case contributed to Petitioner's convictions. Such an error is not harmless beyond a reasonable doubt. Therefore, Petitioner's convictions on the appealed counts must be vacated and the case remanded for a new trial.

### VIII.

In addition, in my view, it is the duty of the court to properly instruct the jury as to the law it must follow. Thus, anytime there is a " 'possibility [ ] that a conviction may occur as the result of different jurors concluding that the defendant committed different acts,' " *Mundon*, 121 Hawai'i at 353, 219 P.3d at 1140 (quoting 719 F.2d at 974–75), or that the jury might conclude that a single act supports more than one count, the circuit courts must be mandated to "instruct the jury that all of its members must unanimously agree to the same underlying act or acts that constitute the conduct they find culpable under the charge, before they may find a defendant guilty[,]" regardless of whether the prosecution elects particular acts in support of the charge. *State v. Kealoha*, 95 Hawai'i 365, 378, 22 P.3d 1012, 1025 (App. 2000) (ellipsis and quotation marks omitted).

This approach would avoid unnecessary error leading to appeals such as this one. *See id.*

### IX.

I concur as to the vacation of Petitioner's sentence on Count 13. However, I would vacate Petitioner's convictions on Counts 8–15, 18–22, and 23–25 and remand for a new trial on those counts. On that ground, I respectfully dissent.